[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: PLAINTIFF'S MOTION TO COMPEL COMPLIANCE REGARDING DISCOVERY REOUEST ON DEFENDANT'S GEN III ENGINES (#154)
In this action, plaintiffs John Evans and his company, Evans Cooling Systems, Inc., claim that the defendant General Motors Corporation (GM) has wrongfully used the engine cooling technology developed by the plaintiffs in its motor vehicles. In their memorandum in support of this motion, the plaintiffs allege that they recently have discovered GM's use of the Evans technology in the currently used third generation (GEN III) GM engines. GM objects to discovery related to the GEN III engines as irrelevant to the instant litigation.
The case involves internal combustion engine cooling systems, particularly an aqueous "reverse-flow" cooling system. The plaintiffs claim that GM misappropriated and incorporated the plaintiffs' system CT Page 11814 into certain of its high performance vehicles, such as the GM Corvette sports car.
In order to consider the context in which the current discovery issue arose, it is necessary to review the history between these parties. Evans and Mecca Development, Inc. contracted with GM in 1988 and 1989 to do engineering work on non-aqueous cooling systems invented by Evans, who held two patents on this technology. (Patent Numbers 4,550,694 and 4,630,572 awarded in 1985 and 1986, respectively.) Mecca Development, Inc. was owned in part by Evans, who was its president. General Motors had agreed to pay approximately $2 million to Mecca, nearly 1.5 million of which was for Mecca's engineering work on the non-aqueous cooling technology for the GM Corvette group.
At the same time he was developing a non-aqueous cooling system, Evans also was developing an aqueous reverse-flow cooling system. A test of the non-aqueous system was scheduled to be run at a GM facility on a GM car in March of 1989. GM had a corporate policy that it would not work with outside contractors on a confidential basis. Parties submitting any technology to GM would have to sign a waiver form renouncing confidentiality so that the only proprietary rights that could be asserted against GM would have to rely on a patent or authorized written agreement. In February of 1989, GM asked Evans if he would allow GM to see the results of his aqueous reverse-flow technology during the same test session. Evans was reluctant to submit the technology on a non-confidential basis, because he did not yet have a patent on the aqueous reverse-flow cooling system; however, GM refused to modify its policy about accepting submissions in confidence. Evans compromised by agreeing orally with GM engineer Al Gunther to a "black box" demonstration in which Evans would install his aqueous system in a test car without allowing GM to view the technology. Consequently, the system would be tested but not disclosed, using the same GM test car on which Evans planned to demonstrate the non-aqueous cooling system.
In March of 1989, Evans and a technician employed by Mecca converted the cooling system in the test car from the nonaqueous system to the aqueous system without involving GM employees or allowing them to view the system. GM and Evans agreed that Evans would hold the keys to the test car so that no one could gain entrance under the hood and examine the system once installed.
Evans' demonstration of the aqueous technology proceeded in this fashion at the GM test facility in Warren, Michigan. The black box testing of the aqueous system took place on March 16th and March 17th
CT Page 11815 of 1989. The plaintiffs assert that GM violated the black box agreement and examined his aqueous system.
GM had been working independently on its own aqueous cooling system at or about the same time.
In September of 1991, Evans read in an automobile journal an article about a cooling system installed in a new Corvette engine for the 1992 model year. The system closely resembled his own aqueous system that he had installed for the black box demonstration at the GM test facility in March of 1989. In July of 1992, Evans filed a patent application on his aqueous system. The patent was issued on October 26, 1993.
Evans sued GM for patent infringement and misappropriation of trade secrets. However, the aqueous cooling system had been installed in a GM Corvette and one such car was sold on June 13, 1991, more than one year before Evans filed his application for a patent on his own aqueous cooling technologies. These facts proved fatal to Evans' patent litigation. Evans Cooling System, Inc. v. General Motors Corp.,939 F. Sup. 154, 155 (1996) aff'd., 125 F.3d 1448 (1997), cert. denied,522 U.S. 1115, 1118 S.Ct. 1050, 140 L.Ed.2d 113 (1998)
This action, which was brought in 1994 in Connecticut Superior Court, seeks damages for misappropriation of trade secrets. The case was removed to the federal district court and was remanded without disposition in September of 1996.
Use of the GEN II GM engines ceased in 1997. At that time, General Motors developed a new generation of engines (GEN III).
Pursuant to Practice Book § 13.2, the scope of discovery in civil actions is limited to matters "material to the subject matter involved in the pending action". GM asserts that the GEN III engine is not a reverse-flow engine and thus any discovery relating to it is irrelevant to the case. A party is entitled to discovery only as to information material to the case or likely to lead to admissible evidence. HeymanAssociates No. 1 v. Ins. Co. of Pennyslvania, 231 Conn. 756, 781 (1995).
In the September, 1991 article which first disclosed GM's use of the reverse-flow cooling technology, the technology was described as follows:
 The Basic Flow Circuit CT Page 11816
 Although the GM execution of the reverse-flow cooling concept goes well beyond the basics, the reverse-flow itself is straight forward and simple: coolant is pumped into cylinder heads, from there it flows into the blocked passages around the cylinder bores, and then finally into the radiator. The appeal of reverse-flow actually was outlined by Dick Donnelly, head of GM's power train division, who said then that this was GM's likely future approach.
 Reverse-flow cooling, Donnelly explained, means that the lowest-temperature coolant (straight from the radiator) goes into the highest-temperature areas — the cylinder heads and their hottest spots — around the combustion chambers, particularly the exhaust valves.
 Because the coolant is at a relatively low temperature, it absorbs the greatest amount of heat, and so the combustion chamber runs a bit cooler. Every little bit helps to prevent the hot spots from causing engine knock.
* * *
 GM's reverse-flow design is a lot more than just a flow circuit. At the back of each cylinder head is a vent fitted with a tube that leads to a pressurized reservoir at the high point of the engine compartment. Coolant must boil to absorb heat efficiently but, at the same time, you want a column of liquid coolant through the engine.
 The vent tubes carry away coolant vapors (primarily boiling glycol, plus any air that may be present), and the bubbles collapse at the top of the reservoir.
American Cooling Journal, September, 1991, Volume 34 #9, pp. 14, 16.
The Generation I or conventional engine involves the flow of the coolant from the radiator to the cylinder block, then to the cylinder head, then back to the radiator. Simply stated, a conventional system is CT Page 11817 the cylinder block first, then the cylinder head; a reverse-flow system is head first, then block.
The plaintiffs now seek to define "reverse-flow" cooling as any system involving a downward flow of the coolant. The plaintiffs argue that the GEN III engine, which involves the flow of the coolant into the engine block, then to the cylinder head, then downward to a coolant outlet to the radiator, is a reverse-flow technology system. This argument contradicts the plaintiffs' previous position in the course of this litigation. In the United States District Court case, the plaintiffs in their second amended answers to GM's first set of interrogatories to the plaintiffs define reverse-flow cooling as follows:
 Reverse-flow cooling refers to any cooling system which first flows a substantial portion of any type liquid coolant from the radiator, by any means of pump flow, to an area of the cylinder head, and then subsequently passes a substantial portion to the cylinder block area before passing the coolant back to the radiator.
The GM Service Manual for its 2000 GM F-Platform vehicles describes the GEN III cooling system as follows: "When the engine is running at the normal operating temperature, coolant flows into the block and through the water jackets surrounding the cylinders. Vapor is vented off through the engine air bleed pipe. Then coolant is forced through the head gasket openings and into the cylinder head water jackets." (Exhibit I to defendant's objection to the motion to compel.) Other reviews of the GEN III engine describe it as conventional cooling and an abandonment of the reverse-flow system.
The plaintiff Evans in deposition testimony described the reverse-flow system.
 As defined by our own answers and as we have defined it for years, reverse flow is the passing of substantially all the coolant from the radiator to the head or substantial portion first, and from the head the coolant is passed to the cylinder block area....
* * *
 Going back to our answers how we have always defined it, because there is many ways to do it, the main CT Page 11818 objective is to first flow the coolant to the cylinder head or a portion of the head, and as we say a chamber it could be more than one chamber, and then from the head the foregoing to the radiator must pass to the cylinder block area.
* * *
 Substantially all the coolant enters the head and passes through the block from the radiator, from the radiator to the head, from the head to block. That is reverse flow, and what it does after it passes into the block is not a limitation on the 636 patent.
Transcript of deposition of John Evans, May 20, 1994, pp. 38, 46-47.
The plaintiffs now assert that the genius of their technology is the venting system which allows the downward turn (generating vapors). This claim, however, is not the claim articulated by the plaintiffs during the course of this litigation. To redefine the claim at this late date would be extremely prejudicial to GM.
The GEN III engine is a conventional flow cooling system, as recognized in the trade press and by an examination of its function. This case concerns aqueous reverse-flow technology; thus the GEN III material is irrelevant to this case and is not discoverable pursuant to Practice Book § 13-2.
The plaintiffs' motion to compel (#154) is denied.
ROBERT F. McWEENY, J.